817 So.2d 634 (2002)
Joseph W. CAPTAIN, Appellant,
v.
MISSISSIPPI EMPLOYMENT SECURITY COMMISSION, Appellee.
No. 2001-CC-00885-COA.
Court of Appeals of Mississippi.
May 21, 2002.
Joseph W. Captain, Pro Se, attorney for Appellant.
*635 Albert B. White, John Wesley Garrett Jr., attorneys for Appellee.
Before SOUTHWICK, P.J., THOMAS, and IRVING, JJ.
SOUTHWICK, P.J., for the court.
¶ 1. Joseph W. Captain appeals an order of the Board of Review of the Mississippi Employment Security Commission. The Board denied him unemployment benefits because it found that he had been terminated from employment for insubordination. Captain argues that the actions giving rise to the charge of insubordination did not occur at work and did not adversely affect the company. We disagree with these allegations and affirm.

STATEMENT OF FACTS
¶ 2. Joseph W. Captain was employed by Brown and Mitchell, Inc. as a resident project representative. Captain was trained as a wastewater process engineer. Brown and Mitchell, Inc. employed Captain from August 12, 1996 until his termination on September 29, 2000. He was without work for a few days and then was rehired. The claims made here are for benefits covering an eleven-day period. It is, Captain argues, the principle of the thing.
¶ 3. Captain was personally acquainted with some of the individuals connected with a Texas murder case. A woman named Darlie Lynn Routier was apparently convicted of killing her two young children and sentenced to death. It appears that Captain wished to prove that Routier had been wrongfully convicted.
¶ 4. Captain forwarded electronic mail messages to some female co-employees that contained correspondence between Captain and other individuals outside the company concerning their theories of the murder. There were also references in these e-mails to a possible plot by Captain's ex-wife to murder him by arsenic poisoning and another murder that he was possibly investigating. It is unclear how many e-mails Captain may have sent or the time period over which the e-mails were sent. Entered into the record were thirty-two pages of electronic mail messages.
¶ 5. Several employees complained to Brown and Mitchell's president, Bill Mitchell, about the "amount of contact that Mr. Captain was having with them." On August 28, 2000, Mitchell received a complaint from a female employee that Captain sent e-mails to her at work and telephoned her at home. This employee also stated that her being called at home caused her husband concern.
¶ 6. Two days later, Mitchell met with Captain and asked him not to discuss the murder case with any Brown and Mitchell employee. Mitchell explained to Captain that his discussion of the murder case distracted other employees and that his calls to female employees at home should stop.
¶ 7. Another meeting between Mitchell and Captain was held September 1. Also present at the meeting were Don Clark, vice-president, and Perry Griffith, senior engineer. Mitchell explained that this meeting was necessary because it had come to his attention that "there were some more communications." At this meeting, Captain was ordered not to contact any employees, especially female employees, either at the office or outside the office unless the reason for the contact was work related. Captain was informed that further such contact would result in his termination.
¶ 8. On September 26, a female employee informed Perry Griffith that she had received another e-mail from Captain. *636 The e-mail was entitled "land mines and office politics." The e-mail requested that this employee meet Captain for lunch so he could inform her as to what and whom she should avoid at work and also to inform her that "I don't see you making it at the company ... the way you are going." The message also discussed office romantic affairs and that failed office affairs could "make going to work unpleasant." Captain told the recipient that "you are a baby to me."
¶ 9. Griffith turned the e-mail over to Mitchell. After reviewing the e-mail, Mitchell found it to be "undermining to our company." Mitchell also determined Captain violated the order given him at the September 1 meeting not to contact female employees at home concerning non-work related matters. Mitchell felt this was cause for termination, despite Captain's record as a "valuable employee." Brown and Mitchell terminated Captain by letter dated September 29. The stated reasons for termination were Captain's "undermining" of the company and insubordination.
¶ 10. Captain filed a claim for unemployment benefits on October 1, 2000. However, on October 10, Brown and Mitchell sent Captain an offer of employment. The contract provided that for two projects Captain would be paid at the rate of $30 per hour and for two other projects he would be paid $25 per hour. Captain's rate of pay at his termination was only $14 per hour.
¶ 11. On October 19, 2000, the claims examiner denied Captain's claim for benefits. Captain appealed that decision and a hearing before a referee was held November 6. The only persons to testify at the hearing were Mitchell, Griffith, and Captain.
¶ 12. Brown and Mitchell's president, Bill Mitchell, stated that he was most concerned with the September 26 e-mail because he believed there were some statements in the e-mail that would make a female employee uncomfortable and because the statements undermined the company. In his closing statement before the referee, Mitchell stated that he was concerned about possible harassment of female employees. Mitchell stated his primary concern was "the need of Mr. Captain or the desire of Mr. Captain to coach other people and to discuss things such as land mines in the office and office politics." Mitchell stated that a secondary concern was that the sending of the e-mail "was directly counter to what I had requested him to do."
¶ 13. Griffith stated that the employee who received the e-mail came to him and stated that she did not know what to do with it. Griffith stated that he came away from the September 1 meeting believing that Captain should not send e-mails to anyone, but that the meeting was focused on Captain not sending e-mails to female employees. Griffith stated that he was "furious" after reading the e-mail. Griffith stated that as a manager he could not have "people going around to new employees and telling them what they should and shouldn't do." Griffith stated that he was also upset that Captain was using the "e-mail system, what we had said shouldn't be used for anything other than business."
¶ 14. Captain pointed out that the email for which he was terminated was sent from his home computer to the personal email address, and not business e-mail address, of the recipient. Captain stated he was uncertain whether the e-mail was received at work or the recipient's home. He did state that the e-mail could be retrieved from any computer with an Internet connection. Captain stated that he only understood that he was prohibited from discussing the murder case and not that he was to have absolutely no contact *637 with female employees outside the office unless it was work related. As for the September 1 meeting, Captain stated that he gave Mitchell and Griffith his word that he would not discuss the murder case with "Brown and Mitchell employees ... at work, off work or any other time."
¶ 15. Captain admitted to sending the September 26 e-mail. He explained that he sent the e-mail to the female employee because she had made a serious error at work and he believed that this particular employee was led into making the error by two other employees. Captain explained he only wanted this new employee to be aware of whom she could trust and to give her good advice.
¶ 16. The referee upheld the decision of the claims examiner. So did the Mississippi Employment Security Commission's Board of Review and later the circuit court. Captain has acted pro se throughout all stages of this proceeding. Captain's appeal has been deflected here.

DISCUSSION
¶ 17. Our ability to review determinations of the Board of Review is controlled by statute. By statute "the findings of the board of review as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of [the] court shall be confined to questions of law." Miss.Code Ann. § 71-5-531 (Rev.2000). Though this is not the normal phrasing for judicial review of administrative agency proceedings, it has been held that the reviewing court will determine whether substantial evidence supports the findings, and if so, the remaining issues are legal ones. Coleman v. Mississippi Emp. Sec. Comm'n, 662 So.2d 626, 627 (Miss.1995). The findings of the Board of Review as to what factually occurred were supported by substantial evidence. We now turn to the legal conclusions drawn by the Board of Review.

1. Misconduct/insubordination
¶ 18. An individual terminated for misconduct is ineligible to receive unemployment benefits. Miss.Code Ann. § 71-5-513 (A)(1)(b) (Rev.2000). "Misconduct" is defined as "`conduct evincing willful and wanton disregard of the employer's interest' not including `mere inefficiency [or] unsatisfactory conduct ... as a result of... good faith errors in judgment or discretion.'" Gore v. Mississippi Emp. Sec. Comm'n, 592 So.2d 1008, 1010 (Miss.1992). To determine whether misconduct has occurred, this Court may "not only assess violations of an employer's stated policy, but ... all action (or inaction) which could be expected of the employee, and which affects the interests of the employer, regardless of whether such actions are included within the stated policy." Mississippi Emp. Sec. Comm'n v. Percy, 641 So.2d 1172, 1175 (Miss.1994).
¶ 19. Insubordination may be considered misconduct. Young v. Mississippi Emp. Sec. Comm'n, 754 So.2d 464, 466 (Miss.1999). Captain was terminated for insubordination as the result of violating a rule or restriction that his employer instructed him to observe. However, "an employee shall not be found guilty of misconduct for violation of a rule unless: (1) the employee knew or should have known of the rule; (2) the rule was lawful and reasonably related to the job environment and job performance; and (3) the rule is fairly and consistently enforced." Johnson v. Mississippi Emp. Sec. Comm'n, 761 So.2d 861, 866 (Miss.2000), quoting MESC Administrative Manual, Part V, Paragraph 1720.
¶ 20. Captain contends that Brown and Mitchell had no right to dictate what he could do in his off-duty time. The only *638 restrictions that Brown and Mitchell placed upon Captain were that he not discuss his murder investigation at work and that he not contact female employees either at work or at home about non-work related matters.
¶ 21. The Supreme Court has upheld a denial of unemployment benefits based on statements made by an employee although that employee was not at the workplace. Johnson v. Mississippi Emp. Sec. Comm'n, 761 So.2d 861, 867 (Miss.2000). In Johnson, the claimant, employed as a nurse by a nursing home, made a threatening statement to an individual concerning that individual's mother, a patient at the same nursing home. Johnson, 761 So.2d at 863. The Supreme Court found the statement by the claimant, even though made off-the-job, was work-related misconduct. Id. at 867. The Court stated that the "threat which was made [was] certainly contrary to the employer's interest in securing a safe and caring environment for its nursing home residents." Id. at 866-67.
¶ 22. Employers also have some authority to prohibit contact between employees. This Court has upheld a denial of unemployment benefits where an employee was ordered to have no contact with another employee, although the restriction in that case appears to have concerned only workplace contact. Hux v. Mississippi Emp. Sec. Comm'n, 749 So.2d 1225, 1227 (Miss. Ct.App.1999). Hux was ordered to avoid a married female employee after Hux's wife arrived at the workplace, confronted Hux, and demanded to meet the female employee, and again ordered to avoid the female employee after the employee's husband arrived at the workplace. Hux, 749 So.2d at 1226. This restriction was valid. Hux's violation of this restriction to constitute misconduct "[r]egardless of how innocent Hux believed the contact to be. ..." Id. at 1227.
¶ 23. The Board found that Captain knew of the restriction placed upon him by his employer. Captain claims that the restriction was only that he not discuss the murder case. The Board agreed with the employer that the restriction included discussion of the murder case and contact with employees both at work and away from work for non-work related matters. Such a restriction, although broader than the restriction in Hux, was reasonably related to job performance and job environment. Brown and Mitchell found the emails to be distracting to other employees. One employee complained that his call or calls to her home made her uncomfortable.
¶ 24. The one question about the findings of the Board of Review is that the September 26 message, which dealt with office politics and the problems of failed office romantic affairs, could in a liberal reading be interpreted as being work-related. We agree, though, romantic affairs at the office are not work-related matters. Captain's raising an issue such as that with a female employee after being warned to leave female employees alone except for work matters was not an innocent violation of the recently announced prohibition. The recipient of the e-mail brought it to the attention of her supervisor. The employer was concerned about charges of harassment.
¶ 25. We find that Captain had violated a known policy reasonably related to the workplace, and there was no evidence of selective enforcement.

2. Other Allegations
¶ 26. Captain raises additional allegations concerning his termination. In a letter to the Board of Review, Captain claimed that he was unaware of "the nature and severity of the allegations" made *639 against him. Had he known, he would have subpoenaed witnesses. Captain claimed he attempted to determine the source of the complaints against him and that at the September 1 meeting Mitchell instructed him to drop his investigation, thereby requiring him to relinquish his Sixth Amendment right to confront his accusers. Captain claimed that his First Amendment rights were also violated. Captain claimed that the various e-mails were not a distraction. Captain also claimed that the female employee whose husband was concerned about his phone call had approached him about a relationship and that he had rebuffed her.
¶ 27. In a letter to the circuit clerk, Captain claimed for the first time that he never saw the report of the claims examiner. The report stated that Brown and Mitchell considered Captain's contact with the female employees as "borderline harassment." The employee interviewed by the claims examiner did not testify before the referee. This document was entered into evidence by the referee. Captain was asked if he objected to the report's entry. He did not. According to the report of the claims examiner, "claimant stated ... he was terminated for disobeying a direct order." Captain also claimed not to have been aware that a female employee complained of his calling her at home.
¶ 28. In his brief to this Court, Captain claimed that an additional cause of the complaints concerning his e-mails was an allegation that he "was trying to develop [a] personal or sexual relationship with ... the female employees." Captain claims he was "blind-sided" concerning these allegations of misconduct with female employees. In direct contradiction of his letter to the circuit clerk, Captain stated he was told that one employee complained of calls he placed to her home, but was not told her name. Captain did admit that he asked one employee if his calling her at home had caused any problems for her with her husband.
¶ 29. Captain was provided an opportunity to bring these allegations to the attention of the referee and failed to do so. We may not consider them now. Captain has no Sixth Amendment right in this case as it is a civil, not criminal, matter. Green v. Bock Laundry Mach. Co., 490 U.S. 504, 510, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989). Captain failed to discuss in what manner his First Amendment rights were violated, and we do not find any violation.
¶ 30. Captain was properly found guilty of misconduct and benefits therefore appropriately denied.
¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY DENYING UNEMPLOYMENT BENEFITS IS AFFIRMED.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, IRVING, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR.